UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,                No. 1:23-cr-40

        vs.                          Hon. Jane M. Beckering
                                         United States District Judge

VINCENT TYLER BROWN,

                    Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

      Michigan Lobbyist Vincent Tyler Brown conspired with his partner Brian Pierce and others to pay $42,000 in bribes to Rick Johnson, the Chair of the Michigan Medical Marijuana Licensing Board ("MMLB"), to curry favor for their clients, including a medical marijuana company ("Company C") seeking licenses from the Board. As a result, Company C was one of the first companies to obtain a license to operate in Michigan's new multimillion-dollar marijuana market.

      When individuals like Brown bribe government officials to achieve their goals, they do more than just enrich themselves at public expense. Corruption robs citizens of access to services, exacerbates inequality, and distorts the marketplace. It is a fundamental threat to the rule of law: it erodes public trust in our government institutions, fuels cynicism toward those institutions, and inhibits effective and accountable governance. This case presents an important opportunity to deter others who might be tempted to pay or accept bribes in the future and punish Brown for the crime he committed. Brown should receive a Guidelines sentence of imprisonment and pay a substantial fine for his role in the offense.

## BACKGROUND

### A.  Facts

### 1.   The Formation of the MMLB and Johnson's Appointment as Chairperson.

The MMLB was a five-member board created by Michigan's 2016 Medical Marijuana Facilities Licensing Act, which allowed dispensaries and other businesses to operate legally for the first time in the State of Michigan.  *See* Mich. Comp. Laws § 333.27301 et seq.  Under the new law, prospective marijuana businesses had to be qualified by and receive a license from the MMLB, which at the time had both the responsibility for implementing the new law and the power to fully administer it.  *See* Mich. Comp. Laws § 333.27302.  Three votes were required to approve license applications. *Id.*

Given the potential profits from this new and lucrative industry – which in 2022 generated $2.3 billion in sales in Michigan – many prospective businesses viewed these marijuana licenses as a golden ticket, a way to make a lot of money, especially if they could be among the first to the market.  As Michigan's medical marijuana law and regulations were being developed, some businesses, including Company C, sought to limit the number of licenses to be issued by the state – to "keep the sandbox small," in their parlance, to attempt to increase their profits even further.

In 2017, Rick Johnson was appointed to be the Chair of the MMLB.  Prior to his appointment, Johnson had a long career in politics, culminating in his service as Speaker of the Michigan House of Representatives from 2001 to 2004.  From 2005 until his appointment to the MMLB he worked as a lobbyist.  While in the private sector, and before the MMLB began operating, Johnson made it known that he was angling for an appointment to the Board.  Johnson and others used his past and current political connections as leverage to obtain nearly $2 million

2

in payments for his lobbying services from individuals and entities related to the medical marijuana industry prior to his appointment to the MMLB.  (R.81: Brown PSR, ¶ 15.)

Brown and Brian Pierce were lobbyists who did business together as Philip Alan Brown Consulting, LLC (PABC).  PABC revenue was split evenly between Brown and Pierce. (PSR ¶ 34.) Brown and Pierce partnered with a third person to form Michigan Grower's Consultants. LLC (MGC), a consulting business designed to represent the marijuana industry in Michigan. (PSR ¶ 69.) Pierce, Brown, and the third partner each had an equal stake in MGC.  (PSR ¶ 34.) Brown, through PABC and MGC, lobbied on behalf of various businesses seeking operating licenses from the MMLB, including on behalf of Company C.

### 2.    The Bribery Scheme.

Before Johnson started serving on the MMLB, he was paid nearly $350,000 by PABC from funds that originated from Company C.  Brown was the primary contact with Company C due to his close relationship with one the company's principals. (PSR ¶ 19.)   As the date of his appointment neared, Johnson met with Pierce, Brown and the third partner of MGC and reached an agreement to continue getting paid after his appointment.   (PSR ¶¶ 18, 30, 107, 116.) According to Johnson, he reached an agreement with Brown and Pierce to accept bribe payments from them to perform work on behalf of PABC's and MGC's marijuana clients who were seeking licenses from the MMLB.  (PSR ¶¶ 107, 116.)  Johnson used his relationship and influence to demand money from Pierce and Brown.  (PSR ¶ 48.)  To disguise the nature of the payments, PABC ostensibly would pay Johnson's wife $2,000 a month for "bookkeeping" services she never actually performed.  (PSR ¶¶ 18, 41.) Company C offered to give Pierce, Brown, and Johnson a percentage of the company, although this agreement was never consummated.  (PSR ¶ 79, 107.)

3

Brown and Pierce leveraged their relationship with Johnson to recruit and retain marijuana clients. (PSR ¶ 19). Indeed, Brown sent a message to Pierce that said, "Our relationship w chair has got us most of our business." (PSR ¶ 28.) On September 9, 2016, Brown sent a message to a Company C representative that said, "We own the board." (PSR ¶ 21.) This was a reference to PABC owning Johnson as a result of the payments to him. (*Id.*)

On May 26, 2017, the day Johnson was named chairperson of the MMLB, Brown sent a text message to a representative of Company C stating, "One step closer to wraiths," referencing an expensive luxury car called the Rolls Royce Wraith. (PSR ¶ 25.) On the same day, Brown also sent a series of messages to multiple friends that said, "Y'all come over. My boy just got appointed chair of the medical marijuana licensing board it's a celebration. Been waiting for this day forever." (*Id.*)

Ultimately, Brown and Pierce paid Johnson a total of $42,000 in bribes to influence and reward Johnson in connection with his official duties as chair of the MMLB. Johnson, Brown, and Pierce used a number of LLCs to disguise the nature and source of the bribe payments of Johnson. Specifically, Brown and Pierce used bank accounts in the names of PABC, MGC, and a company called Flint River Flats, LLC to pay bribes to Johnson by depositing them in bank accounts he controlled in the names of JBJ Ranch, LLC and Common Cents Harvest Farms, LLC. The payments from PABC, MGC, and Flint River Flats were the method Pierce and Brown used to funnel money to Johnson from their work representing marijuana clients who had applied for licenses from the MMLB, including Company C and a Rhode Island marijuana company:

**Post-Appointment Payments to Johnson from PABC and MGC**

| Date | To | Amount |
|------|------|------|
| 6/8/2017 | JBJ Ranch, LLC | $2,000 |
| 7/27/2017 | JBJ Ranch, LLC | $2,000 |
| 7/27/2017 | Common Cents Harvest Farms | $2,000 |
| 9/11/2017 | JBJ Ranch, LLC | $2,000 |
| 10/5/2017 | JBJ Ranch, LLC | $2,000 |
| 12/6/2017 | Common Cents Harvest Farms | $3,000 |
| 12/20/2017 | JBJ Ranch, LLC | $4,000 |
| 2/15/2018 | JBJ Ranch, LLC | $2,000 |
| | **Total** | **$19,000** |

**Post-Appointment Payments to Johnson from Flint River Flats, LLC**

| Date | To | Amount |
|------|------|------|
| 4/28/2018 | Common Cents Harvest Farms | $2,000 |
| 6/4/2018 | Common Cents Harvest Farms | $1,000 |
| 7/6/2018 | Common Cents Harvest Farms | $6,000 |
| 7/11/2018 | Common Cents Harvest Farms | $6,000 |
| 8/3/2018 | Common Cents Harvest Farms | $6,000 |
| | **Total** | **$21,000** |

To further conceal the bribes paid by Company C to Johnson, Company C falsely stated on its license applications that it had no financial relationship with Johnson. Johnson also failed to disclose his financial arrangements with Company C.  Both omissions violated state law.  *See* Mich. Comp. Laws § 333.27305.

In addition to cash payments, Johnson requested that Brown get him tickets to numerous sporting events.  (PSR ¶ 29.) Additionally, at Johnson's request, Pierce paid a total of $2,000 to an individual who was regularly having commercial sex with Mr. Johnson.  (PSR ¶ 36.)  Brown was not personally involved in the payments to the sex worker.

While Brown and Pierce were making the bribe payments to Johnson, they were in regular contact with Johnson while he was MMLB Chair.  Brown and Johnson exchanged 385 text messages between 2016 and September 2018.  (PSR ¶ 26.) Additionally, Brown and Johnson

exchanged numerous telephone calls, some of which occurred at about the same time that Johnson cast votes as MMLB chair for medical marijuana applicants whom Brown and Pierce represented. (*Id.*)

On December 1, 2017, Johnson sent messages to Brown asking how he could remove sender information from an email when forwarding it to another person.  (PSR ¶ 27.) After Brown explained the process, Johnson sent Brown a text asking if he got an email and PDF attachment. (*Id.*) After Brown confirmed receipt of the email and attachment, Johnson sent a message to Brown stating, "Get to others.  This may not be out until Monday. Keep it only inner circle."  (*Id.*)  That same day, Brown sent text messages to multiple clients referring to an email he sent them and informed the recipients not to disclose the attachment because it was not yet public.  (*Id.*)  One recipient referred to the email and attachment as being "the rules" while another recipient told Brown they expected the rules to be released the following day.   (*Id.*)  Brown told one of his clients to remember they always get this type of information from Brown first. (*Id.*)

### 3. Johnson's Official Acts in Exchange for the Bribes.

Johnson admitted that, in exchange for the bribes paid by Brown and Piece, he helped Company C with its application and helped get it through the process by talking to the Michigan Licensing and Regulatory Agency (LARA) and other MMLB members on its behalf. (PSR ¶ 116.) He also said he influenced the formation of rules to favor Company C by pushing for rules that favored Company C's interests in limiting the number of licenses and tracking the licenses to accomplish Company C's desired grow operations.  (*Id.*)  He said he agreed to look after Company C's interest in becoming the biggest and best marijuana company in Michigan, and tried to have the MMLB voting agenda changed to make Company C and the other businesses who paid him the priority.  (PSR ¶ 107.)  He said it was important for Company C to be first on the agenda when

votes were cast.  (PSR ¶ 108.) Johnson also admitted that, while Chair of the MMLB and after he accepted bribes, he provided valuable non-public information about the anticipated rules and operation of the MMLB and assistance with license application matters to Brown and Company C and voted in favor of Company C's applications for prequalification status and for marijuana licenses.

In exchange for the bribes, Johnson took several official acts as MMLB chair that supported license applications submitted by Company C, including voting in favor of its prequalification status in July 2018; voting in favor of its application for growing licenses in October and December 2018; voting in favor of its application for a processor license in February 2019; and voting in favor of its application for a provisioning center license in April 2019.  (PSR ¶ 39.)  As a result, Company C became one of the first in Michigan to be pre-qualified by the MMLB for full vertical cannabis operations—from marijuana cultivation to dispensing—and it quickly became the company with the most Class C licenses in the state.  As Johnson himself put it, there was great value in being among the first companies to enter the medical marijuana market.  (PSR ¶ 104.)

### B.  The Plea Agreements

On April 28, 2023, Brown pled guilty pursuant to a plea agreement to a felony information charging him with one count of conspiracy to commit bribery in violation of 18 U.S.C. §§ 371 and 666(a)(2).  On May 15, 2023, the Court accepted the guilty plea and adjudicated him guilty.

The parties stipulated in the plea agreement that Brown conspired with Brian Pierce and others to pay Johnson at least $42,000 in cash, gifts, and other things of value and that the payments were made corruptly to influence or reward Johnson in connection with his official duties as a member and Chairperson of the MMLB.  (R.5: Brown Plea Agreement, PageID.60)  At the time Brown and Pierce made the payments to Johnson, Company C and other clients that retained their

lobbying firm were seeking operating licenses from the MMLB. (*Id.*) One object of the conspiracy was to obtain clients and generate profits for Brown, Pierce, and their lobbying companies by promoting their access to, and ability to influence, Johnson. (*Id.*) Another object was to reward and influence Johnson while he was serving as Chair of the MMLB to help their clients, including Company C, obtain operating licenses from the MMLB. (*Id.*)

Johnson, while Chair of the MMLB, and after he accepted cash payments and other benefits form Brown, provided valuable non-public information about the anticipated rules and operation of the MMLB, and also helped Brown and Company C with license application matters. (*Id.* at PageID.61.) From in or about July 2018 through in or about April 2019, Johnson voted in favor of approving the prequalification status of Company C and voted in favor of granting marijuana licenses to Company C. (*Id.*)

As it pertains to Brown's offense conduct, Rick Johnson admitted that he corruptly accepted at least $110,200 in cash payments and other benefits from several different sources, including from Brown and Pierce. (R.2: Johnson Plea Agreement, PageID.15.)

### C. The Presentence Investigation Report

The presentence report calculated Brown's offense level as follows:

| | |
|---|---|
| Base Offense Level: | 12 |
| Specific Offense Characteristic (payment of more than one bribe): | +2 |
| Specific Offense Characteristic ($42,000 in bribe payments): | +6 |
| Specific Offense Characteristic (bribes to a high-level decision maker) | +4 |
| Acceptance of Responsibility: | -3 |
| Total offense level: | 21 |

Brown has one previous criminal conviction, giving him one criminal history point and placing him in criminal history category I.  The advisory guidelines range before resolution of Brown's objections is 37-46 months in prison and a fine of $15,000 to $150,000.  The government is seeking a four-level downward departure under Guideline § 5K1.1 in recognition of Brown's substantial assistance to law enforcement in the investigation and prosecution of another person who has committed an offense.  If granted, the offense level becomes 17 and the advisory guidelines range becomes 24-30 months in prison and a fine of $10,000 to $95,000.

## ARGUMENT

### A.  Brown is Not Entitled to a Minor Role Adjustment.

Brown seeks a role adjustment pursuant to USSG § 3B1.2(b), which instructs the Court to decrease the offense level by two points "if the defendant was a minor participant" in criminal activity.  He bears the burden of establishing by a preponderance of the evidence that he is entitled to the adjustment.  *United States v. Mosley*, 53 F.4th 947, 963 (6th Cir. 2022).  A defendant is not entitled to the adjustment unless he was "*substantially* less culpable than the average participant." *Id.* (quoting USSG § 3B1.2 comment. n.3) (emphasis in original). Moreover, "[a] defendant whose participation is indispensable to the carrying out of the plan is not entitled to a role reduction." *United States v. Latouf,* 132 F.3d 320, 332 (6th Cir.1997).

The Guidelines commentary clarifies that, in deciding whether to apply the adjustment, the Court should consider: (1) the degree to which he understood the scope and structure of the criminal activity, (2) the degree to which he participated in planning or organizing the activity, (3) the degree to which he influenced or exercised decision-making authority, (4) the nature and extent of his participation in the criminal activity, and (5) the degree to which he stood to benefit from the criminal activity.  USSG § 3B1.2 comment. n.3.

Brown's role in the offense was not a minor one.  He understood the scope and structure of the bribery scheme – indeed, he bragged about it in a message he sent to a Company C representative that said, "We own the board." (PSR ¶ 21.)  According to Pierce, Brown was present at the meeting where Johnson demanded payments of bribes after he was appointed chair of the MMLB and suggested paying the bribes through his wife.  (PSR ¶ 71.) He participated in the criminal scheme for more than a year: he stipulated in his plea agreement that he conspired with Brian Pierce and others to pay Johnson $42,000 in cash, gifts, and other things of value and that the payments were made corruptly to influence or reward Johnson in connection with his official duties as a member and Chairperson of the MMLB.  (R.5: Brown Plea Agreement, PageID.60.)

Brown was active in the bribery scheme – he was in frequent contact with Johnson, exchanging 385 text messages with him between 2016 and September 2018, along with numerous telephone calls, some of which occurred at about the same time that Johnson cast votes as MMLB chair for medical marijuana applicants whom Brown and Pierce represented.  (PSR ¶ 26.) Johnson turned to Brown when he was upset about not getting paid on time (PSR ¶ 20), or when he wanted tickets to sporting events. (PSR ¶ 29.)  Johnson forwarded non-public MMLB information to Brown, which Brown shared with PABC clients, admonishing them to remember they always received this type of information from Brown first.  (PSR ¶ 27.)

Brown was an equal partner in both PABC and MGC and thus stood to benefit financially from the bribery scheme in terms of recruiting and maintaining marijuana clients for PABC and MGC.  (PSR ¶¶ 19, 34, 40.)  In fact, he went from earning $38,000 to $45,000 a year "knocking on doors" as Chief of Staff for a Michigan congressman, to earning a salary of between $200,000 and $350,000 per year with PABC – primarily because of its relationship with Johnson, which brought in marijuana clients. (PSR ¶ 196-197.)  Indeed, Brown attributed PABC's success to its

relationship with Johnson when he told Pierce, "[o]ur relationship w the chair has got us most of our business."  (PSR ¶ 28.)

Brown contends he is entitled to the adjustment because Pierce was the person who planned and organized the bribery scheme.  But "[a] defendant does not become a minor participant simply because others planned a scheme and made all the arrangements for its accomplishment." *United States v. Miller*, 56 F.3d 719, 720 (6th Cir. 1995).  This is particularly true when a defendant plays an indispensable role in the crime: "A defendant whose participation is indispensable to the carrying out of the plan is not entitled to a role reduction." *Latouf*, 132 F.3d at 332.

As the primary contact at Company C, which funneled the bribe money through PABC to Johnson, Brown was indispensable to the bribery scheme. (PSR ¶19)  This was particularly evident on September 1, 2016, when Brown informed his contact at Company C that Johnson had complained that he was not getting paid in a timely manner.  (PSR ¶ 20.)  On that date, Brown implored Company C to send the payment on September 1, 2016.  (*Id.*)  This prompted Company C to wire $20,000 to PABC's account immediately.  (*Id.*)   A check from the PABC account to JBJ Ranch in the amount of $2,000, dated the same day, was deposited in Johnson's JBJ Ranch account on September 2, 2016.  (*Id.*)

Even if Brown was somewhat less involved in the scheme than Pierce, he still would not be entitled to the adjustment because he was not "substantially" less culpable given his extensive involvement and indispensable role.  Courts have routinely denied the minor role adjustment in these circumstances.  For example, in *United States v. Sherrill*, 972 F.3d 752, 770 (6th Cir. 2020), the court denied a minor role adjustment for a defendant whose role in a Hobbs Act robbery was limited to acting as a getaway driver.  The court reasoned that the defendant understood the scope of the crime because he "was part of" or "at least present [for]" its planning, heard a codefendant

11

assign the various roles, and knew that his codefendants were bringing guns along with them to the robbery. *Id.* The court held that the defendant's role in the offense was not a minor one, nor was he "less responsible" merely because his "task was driving the car, as opposed to walking into the house with a gun," as "everyone ha[d] to do ... their assigned task ... in order for the crime to occur." *Id.*

In *United States v. Miller*, 56 F.3d 719, 720 (6th Cir. 1995), the defendant was convicted of participating in a chop shop operation in which other conspirators stole trucks, removed the vehicle identification numbers, dismantled them, and placed the stolen parts on other salvaged trucks, which were sold as if they had been legitimately repaired. The defendant's role was limited to dismantling the trucks "on several occasions." *Id.* He argued for a minor role adjustment because he was not involved in planning the operation or stealing the vehicles. *Id.* The court disagreed: "Although defendant did not plan the chop shop operation, his role of taking the trucks apart was necessary to its success. A defendant does not become a minor participant simply because others planned a scheme and made all the arrangements for its accomplishment." *Id.*

In *United States v. Karas*, 793 F. App'x 380, 386 (6th Cir. 2019), the court denied a minor role adjustment for a defendant whose role in a kidnapping and armed robbery was limited to luring the victim to her hotel room. The defendant argued she was entitled the reduction because her co-defendants were the ones who planned the robbery, carried the firearms, and robbed the victim. *Id.* Again, the court disagreed because the defendant knew the scope of the plan, participated in it, and shared in the proceeds. *Id.*

Like the defendants in *Sherrill, Miller,* and *Karas,* Brown knew the scope of the scheme, participated in it, shared the proceeds, and preformed an indispensable role. His request for a minor role adjustment should be denied.

**B.  A Guidelines Prison Sentence is Appropriate.**

Brown should serve a Guidelines prison sentence.  As this Court knows, the statutory maximum prison sentence for conspiracy to commit bribery is five years, but the sentence ultimately imposed must comply with the pertinent statutory sentencing factors established by Congress and codified at 18 U.S.C. § 3553(a), including:

**1.   The Need for the Sentence to Reflect the Seriousness of the Offense, and to Provide Just Punishment.**

Section 3553(a) directs the Court to consider the need for the sentence to reflect the seriousness of the offense and to provide just punishment. These factors are among the most important factors a court considers in a public corruption case and they counsel in favor of a significant prison sentence.  Bribery of public officials is a very serious offense because that conduct severely damages the public trust in our government institutions:

> Government corruption breeds cynicism and mistrust of elected officials. It causes the public to disengage from the democratic process because . . . the public begins to think of politics as 'only for the insiders.' Thus corruption has the potential to shred the delicate fabricate of democracy by making the average citizen lose respect and trust in elected officials and give up any hope of participating in government through legitimate channels.

*United States v. Ganim*, No. 3:01CR263, 2006 WL 1210984, at *5 (D. Conn. May 5, 2006) (order denying resentencing of former mayor of Bridgeport).

More pointedly, the 26th President of the United States, Theodore Roosevelt, explained to Congress in 1903 that bribery is a threat to the existence of democracy itself:

> There can be no crime more serious than bribery. Other offenses violate one law while *corruption strikes at the foundation of all law*. Under our form of Government all authority is vested in the people and by them delegated to those who represent them in official capacity. There can be no offense heavier than that of him in whom such a sacred trust has been reposed, who sells it for his own gain and enrichment; *and no less heavy is the offense of the bribe giver*. He is worse than the thief, for the thief robs the individual, while the corrupt official plunders an

13

> entire city or State.... Government of the people, by the people, for the people will
> perish from the face of the earth if bribery is tolerated.

Theodore Roosevelt, Third Annual Message to the Senate and House of Representatives (Dec. 7,
1903) (emphasis added) *available at* The American Presidency Project of UC Santa Barbara,
https://www.presidency.ucsb.edu/documents/third-annual-message-16.

Here, Brown's bribes corrupted the process for the state's issuance of licenses for
businesses to operate in a new and lucrative industry and ensured that Rick Johnson worked not in
the interests of the citizens of Michigan, but in the interests of Brown and the companies he
represented. Individuals and businesses that were denied a license by the MMLB now may wonder
whether they had a fair and equal opportunity to compete in the industry.  Law-abiding qualified
applicants who did not have the ultimate insider "on the take" may have struggled with
understanding and navigating what became a tedious and lengthy application and approval process.
Although the government has no evidence that Johnson's receipt of bribe payments prevented
other qualified applicants from ultimately obtain licenses, Brown's and Johnson's illegal actions
have significantly damaged the trust that law-abiding citizens placed in Johnson's work as Board
Chair and in state government.

Moreover, Brown's conduct cannot be described as a fleeting or one-time error in good
judgment. He and  Pierce made regular cash bribe payments to Johnson 13 different times between
June 2017 to November 2018.  He and Pierce engaged in an extensive scheme to conceal their
activity that involved numerous shell companies, payments for fictitious "bookkeeping services,"
and the use of aliases and burner phones.  These machinations made a mockery of the MMLB's
and State of Michigan's financial disclosure obligations.  Additionally, Pierce and Brown violated
state law by frequently meeting and conferring with Johnson to help their clients secure licenses
as early as possible.  Brown bragged that "we own the Board" and leveraged his relationship with

14

Johnson for his own gain in terms of finding and retaining marijuana clients for his lobbying business.  A custodial sentence below the advisory guidelines range or a probationary sentence would fail to account for the harm he has inflicted by furthering public cynicism and distrust of elected officials and government processes.

### 2.  The Need to Deter Criminal Conduct, Promote Respect for the Law, and Protect the Public.

The need to deter others from paying and receiving bribes may be the most important factor when sentencing Brown for his offense.  Corruption crimes threaten the core values of our country. For this reason, courts have found general deterrence to be a particularly important factor in sentencing corruption cases. *See United States v. Watkins*, 691 F.3d 841, 853 (6th Cir. 2012); *United States v. Anderson*, 517 F.3d 953, 966–67 (7th Cir. 2008); *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("[O]ne of the primary objectives' of sentencing elected officials convicted of bribery is 'to send a message to other public officials that bribery is a serious crime that carries with it a correspondingly serious punishment.'" *Id.* at 450–51 (quoting *United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013)); *United States v. Sorenson*, 233 F. Supp. 3d 690, 699 (S.D. Iowa 2017) ("It must be made plain to the public at large that behavior such as that exhibited by Defendant is categorically unacceptable and will not be tolerated by a self-respecting and functional democratic government.").

In this case, both a corrupt public official and some of the business interests who chose to influence him to secure licenses to operate in the medical marijuana industry have been brought to justice. This case presents the opportunity to deter others who might seek to corruptly influence those who serve in state government, either as an elected official or someone appointed to office by an elected official.  This Court should send a clear message to those who might bribe public

15

officials to gain an unfair economic advantage over their law-abiding competitors that there is real and serious punishment awaiting them in federal court.

### 3.   The Sentence Should Include a Substantial Monetary Fine.

In addition to a prison sentence, this Court should impose a monetary fine of at least $25,000.  In determining the imposition of a fine, the Court should consider the same § 3553(a) factors it considered in fashioning a prison sentence, along with Brown's ability to pay a fine, the expected costs to the government of any prison term and term of supervised release, and other pertinent considerations.  *See* USSG § 5E1.2(c)(3).  Brown has the ability to pay a fine of at least $25,000. Moreover, a fine would further deter him and others from criminal conduct, and it would cover some of the costs to the government for his anticipated imprisonment and supervised release.

Respectfully submitted,

MARK A. TOTTEN
United States Attorney

Dated:  October 4, 2023

/s/ *Clay Stiffler*
CLAY STIFFLER
Assistant United States Attorney

/s/ *Christopher M. O'Connor*
CHRISTOPHER M. O'CONNOR
Assistant United States Attorney

United States Attorney's Office
P.O. Box 208
Grand Rapids MI 49501
(616) 456-2404
clay.stiffler@usdoj.gov
christopher.oconnor@usdoj.gov