UNITED STATES OF AMERICA
WESTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

    Plaintiff,

  v.           Case No. 23-cr-00040-004
               Hon. Jane M. Beckering

VINCENT BROWN,

    Defendant.

_____/

## DEFENDANT VINCENT BROWN'S SENTENCING MEMORANDUM

## FILED UNDER RESTRICTED ACCESS

Because under *Gall v. United States,* 522 U.S. 38, 49 (2007), the proper calculation of the Sentencing Guidelines is the "starting point" for the Court's sentencing calculus, it seems appropriate to begin with a summary of the outstanding guideline issue. The United States Probation Department has calculated Vincent Brown's total offense level at 21, which calls for a guideline range of 37-46 months. Vincent has filed a single objection to the guideline range, arguing that pursuant to USSG §3B1.2(b) his total offense level should be reduced by an additional two levels for being a minor participant. Prior to setting forth the basis for this objection, defendant would note that "[t]he government bears the burden of establishing the factors supporting the enhancement by a preponderance of the evidence." *United States v. Gibson*, 985 F.2d 860, 866 (6th Cir. 1993).

1

Attached as exhibit 1 is a copy of the reasons underlying the objection that was submitted to the probation department. In addition to the reasons set forth in exhibit 1, attached as exhibit 2 is a collection of letters written by family members, friends, past clients, and business associates on behalf of Vincent Brown.  (The letters contained in exhibit 2 are arranged in alphabetical order by the last name of the author of the letter.).  Included in exhibit 2 are letters from Messrs. Ray Foumia, Milan Gandhi, Andrew Przekop, Barry Goodman, and James Deweese, all of whom state that Mr. Brown played a minor role relative to that of Mr. Pierce. Mr. Foumia writes:

> Through a friend I was introduced to Brian Pierce, Steve Linder, and Vincent Brown sometime around February 2017. I met with the group on three occasions between February and August 2017 to see if the industry was something I wanted to be involved in or not. During those meetings Mr. Pierce and Mr. Linder did all of the talking and sales pitch to hire their firm as a consultant. Vincent Brown was very quiet and never said a word unless he was asked a direct question. I honestly thought Mr. Brown was an employee at the firm and sat in on the meetings for observational and learning purposes.

Mr. Gandhi writes that it was his impression that Mr. Brown was an intern:

> We met with Brian several more times before signing on for his lobbying services. During some of these meetings there was another gentleman seated with Brian who never spoke. My partners and I assumed he was an intern. He looked very young and didn't really have any input for our meetings. He seemed to be taking a lot of notes generally and was attending the meetings in a support capacity for Brian.

2

Later, I learned that the young gentleman's name was Vincent Brown, but I still didn't perceive him to have a role outside of supporting Brian and his efforts. As time went on, we began to have some substantive conversations with Vincent, but they always ended with Vincent telling us he would pass on the information to Brian.

Andrew Prezkop echoes these statements:

While working with [PABC], it was very clear that Brian Pierce and/or Steve Linder were leading the charge and did all the talking/negotiating. Vincent Brown was introduced as a junior member of the team that was there to learn the cannabis trade.

Attorney Barry Goodman and his ex-wife, who was also his business partner at the time, met Vincent when they were clients of PABC. Mr. Goodman writes:

Primarily Mr. Brown was new to the company and was learning from the senior partners.  Most times Mr. Brown was present for the purpose of making sure my wife and I were comfortable and provided coffee and snacks while we met with others.

* * *

Though not an excuse he should be given consideration by way of sentencing that he was simply following orders and failed to take charge of his own self.

Finally, Mr. Deweese states:

In early 2017 the writing was on the wall that Michigan was going to have a state regulated application process for multiple lines of business in the cannabis industry. I asked my lawyer his thoughts on the industry and the state of Michigan's ability to roll out such a program successfully. He referred me to a gentleman by the name of Brian Pierce. . . It was through that relationship that I became acquainted with Vincent Brown. Vincent was very young and seem to be learning the ropes from Brian and Steve Linder who had a great deal more experience. I don't recall Vincent being very active in our meetings. He mostly took notes and would assist Brian with simple tasks.

Although Mr. Brown was an equal partner and shared equally in the profits, undersigned counsel respectfully suggests that, relative to Mr. Pierce's role, he was a minor participant.

### § 3553(a) Factors

**1.    The nature and circumstances of the offense and the history and characteristics of the defendant**

**a**. **The nature and circumstances of the offense**

The Presentence Investigation Report (PSIR) accurately sets forth the nature and circumstances of the offense and counsel sees no need to repeat what is contained in the PSIR.  Needless to say, the offense conduct is serious.

**b. The history and characteristics of the defendant.**

The factors set forth in 18 U.S.C. § 3553(a) that guide a judge in determining the appropriate sentence since the Supreme Court's landmark decision in *United States v. Booker,* 543 U.S. 220 (2005) are certainly well known to this Court. Familiar, too, is the Supreme Court's admonition in *Gall v. United States*, 522 U.S. 38 (2007), that in applying these factors, a sentencing judge "must make an individualized assessment based on the facts presented."  Although the promulgation of the Guidelines was an attempt by Congress to promote uniformity in sentencing, *Booker* and its progeny, as well as the factors set forth in 18 U.S.C. § 3553(a), make clear that sentencing involves more than a formulaic response to crime and

punishment; it requires the sentencing court to consider offender characteristics that go beyond the simple issue of criminal history, the only Guideline factor that speaks to the offender.  Indeed, in *United States v. Gall*, 522 U.S. 38, 128 S.Ct. 586, 596 (2007), the Supreme Court properly recognized that a formulaic approach to sentencing is inappropriate:

> . . .the mathematical approach assumes the existence of some ascertainable method of assigning percentages to various justifications. Does withdrawal from a conspiracy justify more or less than, say, a 30% reduction?   Does it matter that the withdrawal occurred several years ago?   Is it relevant that the withdrawal was motivated by a decision to discontinue the use of drugs and to lead a better life?   What percentage, if any, should be assigned to evidence that a defendant poses no future threat to society, or to evidence that innocent third parties are dependent on him?   The formula is a classic example of attempting to measure an inventory of apples by counting oranges.

Fashioning a sentence in keeping with the litany of proper purposes set forth in 18 U.S.C. § 3553(a), and consistent with its direction that the Court "impose a sentence sufficient, but not greater than necessary, to comply with" those purposes has been described as "a holistic endeavor." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015). This description seems altogether apt, in light of the way in which a fair and just sentence should take into account the defendant's life as a whole, and not merely what he or she has done wrong. Lives, and the people who live them, are, after all, three-dimensional, and any judgment about a person and his or her life - or about the appropriate consequences of their wrongdoing - should incorporate that understanding.

"Holistic" as the enterprise may be, federal sentencing practice is a complex and many-faceted process.  An integral part of that many-faceted process is the nature of the man who will stand before the Court when it makes that decision. To provide a more holistic understanding of Vincent Brown, as noted above, counsel has attached to this Memorandum as exhibit 2 a collection of letters from the people who have come to know him best.  Clearly, this is a man whose worst moment-in-time does not define who he is. Some common themes emerge through the words of his friends, family, and colleagues: that he is a man devoted to his family, a loving, attentive husband and doting father, a loyal friend, a selfless man who is always there to lend a hand, a man who gives back to the community, a hardworking and ambitious professional, and despite his criminal conduct, a man of integrity.  As his friend, Max Konz, sums up, "It boils down to this, Vince is a great guy.  He is goodhearted and hardworking, and puts others before himself, especially his family."

Vincent (Vince, Vinny) Tyler Brown was born on July 26, 1990, the second of two sons to the marital union of Dennis and Cynthia Brown.  His parents have been married for over 40 years. His father is a retired contractor who currently works as an automotive parts delivery driver, and his mother is a retired optician.  Vincent was raised in a loving, stable middle class home in Royal Oak, Michigan, where he

currently lives with his wife and their daughter.  His friend Michael Butler, who he has known his entire life, gives a vivid description of his early home environment:

> Growing up just a few blocks away from the Brown's, my home life was a bit different, with divorced parents and a single mother working to raise three children.  I often found solace at the Brown household, where there was always a full plate, and open couch or an extra bed, and an open seat to join them on family trips. While Dennis and Cindy also instilled those same values onto me, it was usually Vincent who I would lean on when I needed someone the most.  Vincent also provided a shoulder to cry on, was quick to crack a smile and cheer you up with his whit (sic) or would provide you with advice he knew you needed, even if you couldn't handle asking …. I am forever indebted to Vincent and his family for the love and kindness they have shown me throughout my life.

Mr. Butler, who is now a Senior Manager at Deloitte Tax LLP, credits Vincent for seeing something in him that many others did not.  He writes. "I strongly believe our relationship, including his guidance and advice, allowed me to flourish and develop into the man and professional I am today."

Dennis Brown noticed his son's empathy and skill of consensus building when he was just a young boy.  He writes:

> My son has been the voice of reason even from an early age.  As a youngster in elementary school, he was a playground mediator that would help resolve issues with other students while on the playground. When we had family discussions or disputes his input was always valued. He has even helped repair broken relationships between my Wife and her brother. He organized a family Christmas which we have not had in years.
>
> ***
>
>  I feel very blessed to have such a caring and loving son.

For Vincent, family always comes first. One of his friends, Isaac Liebes writes, "One of Vincent's most admirable traits is his strong sense of family values." Vincent is very close to his family; he describes his father as his best friend, and his mother as the person who knows him best.  His parents, older brother Alex, and Alex's family live in Oxford, Michigan.  Vincent has been very generous with his family, and provided them a great deal of financial support.  Vincent gave his parents a trip to Ireland, and his father writes, "This was not just any trip, this was a trip to my native land, Ireland. He has never been overseas himself but wanted to make sure we had lived out our bucket list…" His parents were able to retire with his help, although since Vincent can no longer work in his business, acting as a consultant to the cannabis industry in Michigan, due to his bond restrictions, this support has diminished and his father has had to return to work.  Vincent has also been a lifeline to his grandparents, who are 93 and 88 years old.  They live rent free in a rental property Vincent owns. His brother, Alex, writes, that in addition to providing his grandparents a home:

> …[Vincent] continues to be an important part of their care.  Picking up groceries, taking them to doctor appointments or anything else they need. His generosity doesn't stop with my grandparents.  He has been a huge help [to] myself and my wife as we started our family.  When we were planning our wedding, he was there with any sort of assistance he could provide including monetary help."

Alex also speaks of how excited and engaged Vincent was when Alex's children were born.  "When my son was born in 2018, [Vincent] made sure to see

him every day for the first few weeks of his life.  My daughter was born in the middle of the Covid-19 pandemic, but Vincent was still the first person to come see her at the hospital. ... he has such a special bond with them both."

Vincent's greatest loves are his wife and daughter.  He met his wife, Miko, when they were 11 years old, and they remained friends throughout high school. They reconnected when Miko's father died in 2003, subsequently became romantically involved, and married in 2022.  She is a dental hygienist and has a Master's degree in Health Administration. Their baby, Leila, was born in December, 2022.  Miko writes that when Leila was born:

> [Vincent] fit into his new role so effortlessly, it is as if he was born to be a dad.  It is easy to see, of all his accomplishments, being a father is what he is most proud of."  She continues that he is "an exceptionally involved and hands-on parent.  He genuinely wants to share all the responsibilities with me, and for that, I could not have asked for a better partner.

Evan Stephens sees these same qualities in his friend:

> …I have had the privilege of seeing Vince become a father, and the level of pure joy, humility, and love I observed from his was amazing. His family is his world, and to see him with his daughter and wife embodies who he is as a person.  Loving, energetic and deeply thoughtful.

Matthew Marziali writes, "His unwavering commitment to his wife and his boundless love for his new daughter are a testament to the kind of person he is – one who prioritizes the well-being and happiness of his loved ones above all else."

Vincent enjoys exchanging stories with other fathers.  Mark Floria writes, "Since the birth of his daughter, our discussions have changed to how we truly love the impact that our children have had on our lives.  His love for his family is what has driven him to become the best version of himself."  Kevin Devergilio similarly writes, "As a new father myself, I look up to Vince and seek his advice frequently. The days we are able to trade baby meltdown stores over a quick lunch are something that have such a positive impact on me…"  One of Miko's sisters, Besa McDonald, writes, "The mere thought of him being separated from his own daughter and wife is one that is nearly unbearable."

Vincent has been embraced by his wife's family. His mother-in-law, Sadber Karanfili, is a widow.  She says that, although things have been very hard since her husband died, giving Vincent permission to marry her daughter was a very easy decision.  She writes, "I was confident he would be able to love and support my daughter in the way that she deserved…and he has absolutely met this expectation." She continues, "This is all I have ever wanted for my daughter.  But what I didn't entirely expect was how much he cares for me, as well. . . There have been countless times where after a big snowfall, I wake up to Vincent shoveling my walk or it is done before I even wake up." What is most touching to her, is that, "he always invites me out with them to dinner and makes sure I feel loved and appreciated."  Vincent's wife Miko poignantly writes of his devotion to her mother: "I appreciate Vince so

very much for how he treats her – always checking in on her, surprising her with her favorite dishes, and trying to learn Albanian which is her native language."

Next to his family, Vincent cherishes his friends.  He has many close friends, a number of them of them dating back to his childhood.  He is warm and inclusive, making new friends wherever he goes and bringing them into his community.  Many of the attached letters come from people who started out as business associates and ultimately became close friends.   Matthew Marziali is one example.  He writes, "I have had the privilege of knowing Vince for several years.  From our very first interactions, it became evident that Vince was more than just a professional contact; he was someone who embraced friendship as a core value in his life." His friendships are characterized not just by their number or duration, but by their quality.   Joe Banayai, who has known Vincent for nearly his entire life, describes Vincent's approach to relationships: "What sets Vince apart from anyone I know is his intentionality when it comes to relationships."

In the attached letters, the Court will read many examples of his selflessness. Christopher Snooks tells the story of an elderly woman who lives a few blocks from Vincent.  She gets the paper delivered, but, "It is usually thrown onto the lawn aways from the door, where the infirmed widow can't walk.  Vince, however, makes a trip out of his way to make sure the woman is able to do her cross-word puzzle.  No one

knows this, but I happen to be friends with the woman's daughter.   He's been doing this for a couple of years."

An example of his innate compassion comes from Ethan Jones, who has known Vincent since they were 4 years old.  "When I was 18 years old I lost my dad and Vince was there.  When I was 21 years old I lost my twin brother and Vince was there.  In times when absolutely nothing can be done to help, Vince did the only thing he could do, be there for his friend."

Ms. Leah Miller also speaks to Vincent's empathy and kindness:

> I vividly remember when along with Vincent's kindness, I also realized how selfless and generous he was. His now wife, Miko, experienced the tragic and sudden loss of her father the day before Thanksgiving in 2003. Miko and Vincent were not married nor even dating at this time, yet it was Vincent who reached out to me and my then boyfriend wanting to do something to ease Miko's pain, coordinating sending flowers to her and her family. As you read this letter, the task of sending flowers may seem simple, however, it exemplified so much more as to Vincent's character. At the time, Vincent would have only been twenty-three, however, he exemplified empathy far beyond men several times his age in his ability to recognize someone in pain and feeling called to do what he could to ease that burden. The generosity and selflessness he showed as a young man in extending that kindness to someone who he expected nothing from in return, as he and Miko were not yet in a relationship, was astounding to my twenty-three-year-old self.
>
> * * *
>
> In 2016, I tragically lost my older brother, only days after his thirtieth birthday. It left a hole in my heart that can never be replaced. However, despite that, having a friend like Vincent who did not hesitate to fill the "stand-in" older brother role would mean so much through the years. I remember Vincent always stepping up to be the dependable helper or trusted protector, in times when I would have leaned on my brother. If I was ever stranded on the side of the highway in the middle of the night, it has always been Miko and Vincent who I know would pick up

the phone, no matter the hour or ask, and rush without hesitation to support a friend. It's no surprise Vincent fills this role so easily, as it is who he has always been. He's a family man at his core. A dedicated and adored uncle, faithful son, and committed younger brother. I have witnessed his generosity and love within his own family throughout the years and am grateful that I have been able to be a recipient of this as well.

Cassandra Keller concurs:

One instance that stands out in my mind is when he demonstrated exceptional kindness towards me and my beloved Great Dane, Winston. Vince didn't hesitate for a moment when I needed someone to take care of Winston, who is a large and slobbery dog.  He (Vincent) graciously opened his new home to Winston, despite the inevitable fur shedding and drool marks on the walls that comes with having such a dog.  This selfless act showcased Vince's understanding of how much Winston means to me and his boundless compassion.

Moreover, Vince's compassion extends beyond just friends and their pets.  He extended a hand to a young man named John, who was living in my basement.  Vince provided John with more affordable rent at one of his secondary homes, which was a lifeline for John…

Vincent upholds his core values in his friendships. Dwayne Cureton first met Vincent in 10th grade, when Mr. Cureton moved from Detroit and started at Royal Oak High School.  This is not an easy transition for a high school junior, but he writes that Vincent was one of the first people to befriend him.  They became college roommates and remained very close even though Mr. Cureton moved to Chicago. He recounts a story that gives a true insight into Vincent's character.

…I have always marveled at Vince's ability to stay connected to myself and all of our other friends.  We would all get together for an annual football game when the Detroit Lions would play the Chicago Bears in Chicago.  One of those weekends we went out to some bars me being

the only minority in the group, when one of the establishments would not grant me entry.  It was clear I was being profiled because of what I look like.  Vince stepped up and called the security team out for what they were doing and told them how wrong it was.  Once the security saw everyone I was with was white he wanted to let us in, but Vince stepped in and spoke up on how wrong that was and told them they will not be getting our business.  We made sure to leave as a group and other onlookers joined the group in disagreement.  That's my friend right there.

Vince's parents, neither of whom attended college, stressed to their son the importance of higher education.  He enrolled at Saginaw Valley State University from 2008 to 2010, then transferred to Central Michigan University in Mt. Pleasant, majoring in Political Science.  His friends write that he was an unusually hard-working, driven, and ambitious man.   This was perhaps most evident during his junior and senior years in college, when he was a volunteer intern at the state legislature. Max Konz, a college friend, explained:

> Vince's determination and work ethic stood out to me immediately…
> He commuted from Mt. Pleasant to Lansing several times a week, volunteering while continuing to stay on top of his studies.  It was clear that when Vince takes on a task, he is fully committed to fulfilling all duties that are required to complete the task to the best of his ability and working through the proper processes no matter how difficult they may be.

In addition to his duties in the legislature, Vincent also took on the responsibility of organizing a morning basketball league for members of the state legislature, interns, and staffers. While his friends may have been sleeping in, Joe

Banyai explains that "Despite not being paid to do so, he woke up before dawn to drive to Lansing and made the trek back after basketball to attend class…"

Following graduation, his hard work paid off; Vincent was hired as the Legislative director for Michigan House of Representatives member David Nathan. He held that position for two years, when he accepted a position as Chief of Staff for House member Robert Kosowski. During his tenure in the House, Vincent became known as a highly effective aide who worked well on both sides of the aisle.

It was during his time in the House when Vincent met his co-defendant Brian Pierce, a staffer for Representative Klint Kesto. (Representative Kesto was the lead sponsor of the medical marijuana bill package.) In his presentence report, Vincent writes that, "Brian had been involved in politics for over 15 years at the time and he appeared to me a (sic) reputable and knowledgeable about Michigan politics."[1] He continues, "As a 23 – 24 year old, I was very impressed with Brian and I viewed him as a mentor. In late 2015, he approached me and said he was leaving his employment with the state to focus full time on his consulting company," which helped prospective entrants understand the laws governing cannabis and helped them get licenses

---

[1] In addition to his statements contained in the PSIR, attached as Exhibit 3 is a letter to the Court in which Vincent describes how he became involved in the offense, the effect his conduct has had on him and his family, how he has changed the trajectory of his life, and his extreme remorse for becoming involved in the bribery scheme.

At the time, Vincent was making about $40,000 a year in the legislature, and working for Brian Pierce appeared to be the opportunity of a lifetime. It not only was accompanied by a significant increase is salary but he saw it as an opportunity to work with individuals who were getting in on the ground floor of a nascent industry. Vincent describes how what appeared to be an excellent opportunity turned out to be a Trojan Horse: "Believing this was a wonderful opportunity, I accepted his offer. It turns out, this was the worst decision of my life. I blame myself for my blind ambition." Vincent has said that his most detrimental personality trait is his drive to succeed, and he found that ambition clearly is a double-edged sword.

Despite his admitted involvement in the crime to which he has pled guilty, the letters of Messrs. Foumia, Ghandi, Przekop, Goodman, and Deweese make clear that Mr. Brown is certainly less culpable than his co-defendant, Brian Pierce, whether or not this Court finds Mr. Brown to be a minor participant

In his statement contained in the PSIR, Vincent recounts when the problems began:

> After just over a year or so in business together, Brian came to me and said that Rick Johnson's wife, Janice, was going to be our new accountant for the business and was to be paid, $2,000 a month. I questioned this and asked him if it was legal since her husband was chairman of the Michigan Medical Marijuana Board and we were working (with) clients who were hoping to get medical marijuana licenses. He responded that this is how it goes in politics. *I should have walked out right them but being young and as mentioned above ambitious I stayed…Again, I should have left but didn't. . . I wish I had*

> *never left the legislature and regret trusting Brian Pierce when making
> my career and life decisions.* (Emphasis added)

ECF No. 81, Page ID. 701, ¶ 142.

Attorney Barry Goodman assesses the situation as follows: "Quite simply, Mr.
Brown was foolishly naïve and was not able to see the bigger picture of what he was
involved in. I believe that he was young and uninformed and taken advantage of
during his time with Philip Brown." Chris Dyla had a similar perception, writing,
"In regard to Vince's career, I see Brian Pierce as an unfortunate steppingstone that
many young politicians unknowingly get wrapped up in.  Vince looked up to Brian
as a steward in the political space and was given false hope of a legitimate business
opportunity."  Mr. Dyla also writes of the contrast between Vincent and Brian Pierce:

> …I was always impressed with Vince's understanding of the cannabis
> laws and licensing process. Never ONCE did we talk about the need for
> illegal activity to execute our plans.

The meetings with Brian Pierce had a decidedly different tone. When they did
meet, Mr.  Dyla was asked for money outside of his consulting contract. Of meetings
with Brian Pierce, Mr. Dyla writes:

> …We would always decline offers to pay various representatives or
> blindly donate to whatever political campaign Brian was supporting.
> Brian and our team did not see eye-to-eye regarding the necessity to
> pay/donate to political figures to get a license….
>
> Meetings with Brian always required an immediate call after from
> Vince to explain why not to listen to Brian's illegal suggestions.
> (Vincent) would tell me how we could get licensing with hard-work and
> persistence just as easily. Vince ALWAYS advised me not to move

forward with blind donations. These are the morals and values that Vince Brown has always upheld as long as I've known him.

Although Vincent was uncomfortable with the firm's conduct, he believes that substance abuse clouded his judgement and contributed to his offence. He admits to substance abuse problems, and that he was "under the influence of alcohol and drugs during the commission of the offense." These issues were amplified during his time at PABC: "With the job I had, it included a lot of entertaining and being out with clients… I was the person in charge of entertaining clients and taking them to dinner. …While out with clients and prospective clients, I would be drinking 4-5 times a week…I was not thinking straight when I made my decision to break the law and I regret it wholeheartedly." *Id* at Page ID 709, ¶ 189.

Ultimately, Vincent could no longer tolerate the illegal conduct that he and his partners at PABC engaged in and in 2018, and well before he was under investigation, he voluntarily left PABC and established his own firm, Artemis Consulting. Unlike PABC, Artemis Consulting strictly adhered to the letter and spirit of the law. Artemis's clients were shocked to find that this was the same man who went along with the culture at PABC.

Benjamin Sobczak, an attorney, specializing in cannabis law who worked with Artemis, describes how Vincent earned the respect of others in the cannabis industry:

> I did not know Vince during the occurrence of events which have now, years later resulted in his current legal troubles. Professionally, that is not the Vincent I know. The Vincent I know was an anchoring force in

Michigan's licenses cannabis business (sic).  He knew everyone and everyone knew and respected him… The work that I have personally witnessed him do has greatly improved the integrity, functionality and health of that business environment.  His candor and high degree of integrity was a blessing to our organization.

Another Artemis client, Christoper Klamin, also describes how Vince operated Artemis with the highest ethical standards: "Mr. Brown has advised us with 100% compliance and towards solutions that are always ethical and within the guidelines of the cannabis regulatory agency of Michigan."  Scott Roberts, an Artemis client and managing partner in a law firm focusing on the cannabis industry, found Vincent to be, "an honest, generous, and upfront person…" Based on their professional interactions, he does not believe his actions which bring him before the Court "are a reflection of his character, but instead are out of character of the person I know."  Zoran Bogdanovic, another client, notes, "I must emphasize Vinny's exceptional honesty and transparency in all his dealings with me." Finally, Mr. Deweese who, after leaving PABC, hired Vincent's new company Artemis describes the contrast between PABC and Artemis:

> After searching for some time, we eventually found our way back to Vincent and it's been one of the best decisions we have ever made. He has been an absolute blessing and the contrast in ethics and professionalism between Vincent and his former bosses is resounding.

Vince's ethical lapse is certainly not lost on him and there is no doubt that his remorse is sincere. He writes, "This offense that I have unfortunately committed has been a life altering event . . . I have let so many people down that look up to me and

brought shame on my entire family." *Id* at Page ID 701, ¶ 142. As noted above, because marijuana is still a violation of federal law, a condition of his bond prevents Vincent from acting as a consultant in the cannabis industry.  As a result, he has lost his entire business.   His wife, Miko, writes that despite this hardship, Vincent has used his resourcefulness to earn a living outside of the lobbying and cannabis industry:

> Vince was forced to stop doing his job, a company he loved and proudly built alone.  He has had to completely reinvent himself in order to support us.  It is not easy having your career stripped away…

He now owns and operates VTB Properties, LLC, and has 6 rental properties, 4 of which currently generate income, but far less than he was making at Artemis Consulting.



.  His current situation has only exacerbated these problems, and he is seeing a counselor, Zina Samona.   As he told probation:



*Id* at Page ID 708, ¶ 185.

Vincent is not unique in fearing the pain both he, his daughter and his wife will suffer from his possible absence, and this fear is contributing to his anxiety and physical

problems, including a 15-pound weight loss. Ms. Samona describes the significant

psychological toll the case has had on Vincent:

> Vincent began his bi-weekly treatment in May of 2023 shortly after
> pleading guilty to bribery in late April of 2023.



Ms. Samona's letter is attached as exhibit 4. She also writes that Vincent is

overwhelmed with guilt due to his involvement in this offense, and that his substance

abuse played a role in his poor judgment:

> In addition to treating the above symptoms, Vincent and I have
> addressed his involvement in the bribery scheme,
> In discussing his participation in the bribery
> scheme, it is clear that he is overwhelmed with guilt due not only to the
> fact that he broke the law but also feels he has let down his wife and
> daughter, particularly because he may be separated from his family in
> the event he is sentenced to prison. During our sessions, he frequently
> cries when discussing his participation in the bribery scheme.
>
> * * *



Currently, Vincent's relapse prevention plan includes acknowledging his problems, spending time with his family, praying, and avoiding people who enabled this behavior.

Ms. Samona states that the counseling has improved Vincent's mental state and has helped him make better decisions in his life:

> Vincent has been consistent with his treatment and he has shown improvements in his anxiety, depression, and sadness.  He also is making better decisions for himself and his family. Therefore, I believe with continued counseling, Vincent will develop better self-awareness, manage anxiety and depression.

Ms. Samona recognizes that in determining the appropriate sentence, the Court takes a variety of factors into consideration. Nevertheless, Ms. Samona is concerned that a prison sentence could undo all the progress Vincent has made:

> I am concerned, however, that even a short separation from his family could undo the progress we have made over the last several months.  I fully understand that as a judge there are several factors that you look at in determining the appropriate sentence separate and apart from the effect the sentence will have on a defendant and his or her family.

Finally, and perhaps more importantly, Ms. Samona believes that Vincent knows that what he did was wrong and that the conduct which brings him before the Court will not repeat itself:

> I can say with a great deal of confidence, however, that Vincent fully understands that what he did was wrong and it is my professional opinion that there is virtually no risk of recidivism.

Ms. Samona's belief is shared by his close friends and family. His friend Christopher Snooks writes, "…he knows what he did is wrong and…he has been trying to make up for it ever since."  His brother-in-law Daniel McDonald echoes that sentiment:

> I have personally witnessed Vincent show immense remorse toward his situation and the mistakes he has made.  He has apologized to the family numerous times for bringing this upon us.  He has always taken responsibility and owned up to his actions.

Mrs. Karanfili, his mother-in-law, writes, "I know how remorseful he is and he has apologized to me for bringing this situation upon our family countless times."

Mr. Richard Karp, who first met Vincent when he was a legislative aid and has remained friends with Vincent throughout this ordeal speaks of Vince's remorse and his work with non-profits:

> As I've remained friendly with Vince during the publicity of his plea, I've observed profound remorse, culpability, and reflection. This has greatly impacted his outlook and behavior toward the world, much for the better. While having lost his primary source of income, I've seen him pivot to a career outside of lobbying to care for his new family along with lots of volunteer work for meaningful non-profits.

The letters leave no doubt that Vincent's remorse is genuine and heartfelt, and is displayed not only in his words but his actions as well.

Vincent is certainly not the same man that he was during the time he participated in this offense.  He has matured as a person and found fulfillment through his wife and daughter.  Vince writes "…looking back at my prior lifestyle, I

don't recognize that person.", an observation mentioned by many who know him. *Id* at Page ID 709, ¶ 189. His wife writes, "…he is not the same 25 year old he was… He now lives his life with deeper purpose."    Marcus Braman was the Supervisor of Windsor Charter Township when he met Vincent. At the time Vincent had a client who was trying to better understand local ordinances. In describing Vincent, he speaks to the maturity he has gained over the years, how he has taken responsibility for his conduct, and that he has no doubt that Vincent is committed to self-improvement:

> During the nearly 7 years of friendship, I have seen Vincent grow as a man.  He has made mistakes and has taken responsibility for those mistakes.  He has shown maturity, both in his actions, his advice and has done everything he can to continuously look out for those around him.  He has done his best to advise his clients, friends and family in the direction he best believes serves them and not himself and deserves to continue doing so for years to come.
> …He is a young father that is striving to raise a beautiful girl. … There is no doubt in my mind that Vince will continue to move forward toward constant self -improvement. He now has a greater reason than ever as he raises his daughter and provides for his wife.

Mr. Braman believes that Vince's "priorities at this point are far more directed than most in their early 30's …"

It is hard to reconcile Vincent's criminal conduct with what friends, family, and clients have observed over the years.  The letters share a consistent theme: Outside of this offense, Vincent is a man of character and integrity.   His friend, David Lyons, writes:

I believe this offense was extremely out of character for Mr. Brown and from what I have seen since this event happened, he has shown extreme remorse for his actions. Throughout our friendship I have seen Vince grow significantly as a person.  From starting his own company, getting married, having a child. Vince has definitely matured over these years.

Scott Roberts writes, "I do not believe these actions are a reflection of his character, but instead are out of character of the person I know." Derrick Gergis, who has worked with Vincent on a personal and professional level for the last 5 years echoes this belief: "To me and many who know him, the accusations are inconsistent with the person we have come to respect and admire…"

Last but certainly not least, Vincent has been active in charitable causes, both financially and through hands-on volunteer work.  Teuta Wojkowich, one of Miko's sisters, writes "Vince just has a natural, effortless desire to take care of people." Isaac Libebes adds "He actively seeks out opportunities to volunteer and contribute to various community initiatives, always ready to make a difference.  Whether it's participating in local charity events, mentoring aspiring young minds, or supporting those less fortunate." Brian Wickersham is the Chair for Trinity Community Care, a Christian based organization which provides free medical and dental care to those who cannot afford it.  He writes how Vincent, rather than being asked to help, reaches out asking how he can help:

…Vince has asked me numerous times how he can assist with Trinity Community Care…he has worked to connect us with additional dental volunteers through his wife Miko, as she's in that profession. Additionally, the number of fundraisers Vince supports that I've received invites to is countless.

The Super Drew Foundation is a 503(c)(3) which was founded five years ago to help families of children with pediatric brain tumors.  Vincent has been involved since its inception.  Melissa Akash, who helped create and manages the foundation, writes:

> Vince has been part of the foundation from day one.  Not only helping with the vision and creativity to help others but volunteering and being a part of helping get the foundation name out to the public.  In addition to financially donating money and sponsoring events he has always shown up …lending a hand with a logistical issue, attending an event, or finding other families we can help, he is there.

Vincent also volunteers with First Tee of Greater Detroit, a youth development program whose mission is to empower kids and teens through golf.  His brother, Alex describes Vincent's volunteer work with First tee of Greater Detroit:

> He is able to share his enthusiasm for the game of golf with the children and teens in the program.  More important than teaching the basics of golf, Vincent helps the participants build strength of character and other important lessons that will last a lifetime.

Vincent is being honored as volunteer of the year for his work at the Corner Laundry and Shower in Detroit, a multi-faith organization whose mission is to offer their guests, many of whom are homeless, access to clean, safe showers and laundry. Kashira Dowridge, the operations manager, writes that, "In order to survive, we

depend on volunteers and donations from the public…Mr. Vincent Brown is one

such volunteer." She continues:

> Mr. Brown volunteers between 6 and 8 hours a week, never misses a
> day, and is always on time. While at the Corner Shower and Laundry,
> Vincent performs some of the least desirable tasks; he cleans the
> showers in between uses and provides clean towels to our guests. On
> the days he volunteers, he is also responsible for keeping the entire
> bathroom area clean. In additions, on occasion, there is a group of
> autistic volunteers and Vincent helps manage them and teaches them
> how to carry out their tasks. Vincent has also donated toothbrushes and
> tubes of toothpaste, razors, soap and clothes. Vincent has also done
> work in our facility, installing shelves in the wall that we needed
> Vincent provided all the materials and labor and was happy to help us
> further. Perhaps most importantly, he treats our guests with dignity and
> has developed personal relationships with many of them. Based on his
> dependability, strong work ethic, and huge heart, he is being honored
> this year as volunteer of the year. He is hands down our best and most
> active volunteer.
>
> ***
>
> He has become an integral part of our organization and we truly value
> his continued help and support. Vincent's above and beyond effort has
> been a huge help to our mission.

In the event this Court imposes the requested non-custodial sentence coupled with

community service, Ms. Dowridge writes that she would love to have Mr. Brown

continue with his volunteer service:

> Vincent has advised me that he has pleaded guilty to bribing a public
> official and that his lawyer is requesting that in lieu of a prison sentence,
> Vincent be sentenced to perform community service. If you believe that
> such a sentence is appropriate, our organization would love to have
> Vincent continue his volunteer work at Corner Shower and Laundry. He
> has become an integral part of our organization and we truly value his
> continued help and support. Vincent's above and beyond effort has been
> a huge help to our mission.

His brother Alex writes of the meaning this has had on his brother: "The fulfillment he has gotten from helping to provide such a basic human need is truly inspiring."

Vincent has also volunteered at the Preserve Independence Counseling and Adult Day Center a non-profit organization that provides a variety of services to developmentally disabled in Macomb County. Mr. Christian Franke, the administrator writes:

> I am writing this letter to express my support for Vincent Brown, who has contributed as a weekly volunteer at Preserve Independence. As someone who has had the pleasure of working closely with Vincent during his time at our organization, I can confidently say that he has made a positive impact on our non-profits mission serving our developmentally disabled population in Macomb County.

Vincent is also active in his local community. He served on the Royal Oak Parks and Recreation Senior Services Advisory Board and the Royal Oak's Financial Audit Committee. He has since resigned from these positions because he did not want to bring negative publicity to Royal Oak.

Deanna Bilek cites among his volunteering at a local Trick-or-Treat event, where, "he not only made us feel welcome, he was even kind enough to sneak our daughter an extra fun-size Snickers… he has established himself as an integral part of the community."

It is well established that a defendant's charitable and good works are proper factors to consider in determining whether to grant a variance. *United States v.*

*Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming three month sentence where guidelines called for a 63-78 month sentence for Medicare Fraud involving a loss of over $5,000,000 based primarily on defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others."); *United States v. Tomko*, 562 F.3d 558, 571 (3rd Cir. 2009) *en banc* ("District court did not abuse its discretion in sentencing defendant to probation with a year of home detention, community service, restitution, and fine for tax evasion, rather than to term of imprisonment based on 'his negligible criminal history, his employment record, his community ties, and his extensive charitable works.' ")

## 2. The "need for the sentence" to comport with the traditional purposes of punishment.[2]

a. Retribution.

The first of the statutory factors requires that the sentence imposed should "reflect the seriousness of the offense, . . . promote respect for the law, and provide just punishment for the offense." Such measurements are of course difficult to draw with precision. This offense represents Vincent's first felony conviction. Even without considerations of a sentence that involves imprisonment, the consequences

---

[2] The "traditional purposes of punishment . . . include retribution, rehabilitation, prevention of further crimes by the defendant, and deterrence of the defendant and others who might contemplate committing similar crimes. *Hobbs v. County of Westchester,* 397 F.3d 133, 158 (2d Cir. 2005) (citing 1 W. LaFave, Substantive Criminal Law § 1.5(a)(2d ed.2003).

stemming from this conviction are severe.  Mr. Brown, after leaving PABC, started his own cannabis consulting firm, Artemis, which quickly became very successful. Because marijuana is still illegal under federal law, Vincent will no longer be able to work as a consultant to the cannabis industry. As this Court well knows, a felony conviction acts as a Scarlet Letter and will certainly limit Vincent's future employment opportunities.

While undersigned counsel certainly recognizes that punishment is a factor in the sentencing calculus, he respectfully submits that a prison sentence is not necessary to satisfy this factor. A sentence that requires a term of probation with one year of home confinement and 500 hours of community service, or alternatively, one day of imprisonment followed by a term of supervised release which this Court deems appropriate is certainly ample punishment when balanced against his level of culpability vis a vis other members of the conspiracy, his exemplary life both before and after his participation in the conspiracy, his mental health issues, and his undeniable valuable cooperation, as detailed below.

While a sentence of probation is qualitatively different from a prison sentence, as stated by the United States Supreme Court in *Gall*, probation is, nevertheless, a substantial restriction on one's liberty:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms.   Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.   See *United States v. Knights*, 534

U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting Griffin v. Wisconsin, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); internal quotation marks omitted)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. U.S.S.G. § 5B1.3.

*Id* at 48.

b.  Deterrence - General and Special

The two species of deterrence call for two kinds of analysis. As for general deterrence - the need to fashion a punishment which will deter the public at large from taking the same course of action as did the defendant - it seems reasonable to conclude that a sentence which results in Vincent Brown having a felony conviction with either of the above proposed remedies would serve as a sufficient disincentive to others who might otherwise be tempted to engage in similar conduct. Moreover, the recent spate of prosecutions for "white collar crime," have been well publicized and certainly should serve as disincentive to others.

With respect to special deterrence - the need to dissuade the defendant himself from future illegal conduct - the question seems far simpler. Vincent's letter (ex 3), as well as, the letters submitted on Vincent's behalf leave no doubt that he is extremely remorseful and has taken full responsibility for his actions.   Vincent

Brown has certainly gotten the message and a prison sentence will have absolutely no effect on his future conduct.

### c.  Incapacitation

"The rationale for incapacitation is to allow society to 'protect itself from persons deemed dangerous because of their past criminal history.'"  *Allen v. Woodford,* 395 F.3d 979, 1009 (9th Cir. 2004) (citing 1 W. LaFave & A. Scott, Substantive Criminal Law 38 § 1.5 (2003)).  As stated above, counsel submits that there is simply no reason for the Court to believe that Vincent Brown poses a danger to the community.

### d.  Rehabilitation

There is little doubt based on Vincent's post-offense conduct and the letters from his family, friends, and counselor that Vincent has been fully rehabilitated.

## 4 & 5. The Guideline range and any pertinent policy statements

As noted above, the United States Probation Department has calculated Vincent's guidelines as 37-46 months.   In the event this Court agrees that Mr. Brown should receive a two level reduction for being a minor participant, his guideline range will be 30-37 months.

Upon information and belief, the government will be filing a motion for a downward departure requesting that the court reduce Mr. Brown's guideline range by four levels based on his substantial assistance.  It is undeniable that Mr. Brown's

cooperation exceeded the cooperation of anyone else in the case. When the search warrant was executed at his house, he agreed to speak with the agent without the presence of an attorney. According to the Government, in his first proffer session, unlike his co-defendants, he was fully open and honest. In total, Mr. Brown has participated in 7 proffer sessions related to this case spanning approximately 15 hours in which he truthfully detailed his involvement and that of his co-conspirators. In addition, he testified before a grand jury ████████████████████████ ████████████ His cooperation and willingness to testify at any trials played a critical role in the Government's ability to bring charges against his co-conspirators.

In addition to his cooperation in this case, Mr. Brown also met with and provided information to agents and an Assistant United States Attorney for the Western District of Michigan in an unrelated case. This investigation is on-going. On September 14, 2023, undersigned counsel spoke with the aforementioned Assistant United States Attorney in charge of the investigation who stated that Mr. Brown was truthful and forthright.

## 6. The need to avoid unwarranted sentencing disparity.

The key word here, of course, is *unwarranted. United States v. Newsom,* 428 F.3d 685, 689 (7th Cir. 2005) ("we begin with the observation that § 3553(a) does not ban all disparities; its concern is only with unwarranted disparities.") As more fully explained below, when considering all the 3353(a) factors, counsel respectfully

suggests that the requested sentence would not constitute an unwarranted sentencing disparity.

The United States Sentencing Commission (U.S.S.C.) maintains a comprehensive, computerized data collection system of federal sentencing information which includes, among other things: (1) the judgment and commitment order; (2) the statement of reasons (including the reasons for any departures or variances); (3) any plea agreement; and (4) the indictment or other charging document.  The U.S.S.C estimates that 99% of all cases are included in this data set. The United States Sentencing Commission publishes on its website its annual Sourcebook which contains sentencing statistics for broad categories of offenses. The Sourcebook does not, however, contain a breakdown for different offenses within each category.

In an attempt to determine sentences nationally[3] for defendants similarly situated to Mr. Brown, counsel retained MCM Data Consulting (MCM) which has access to the United States Sentencing Commission data base. After reviewing the Guidelines calculations reflected in the Presentence Investigation Report and Addendum, MCM did an analysis of sentences imposed upon defendants sentenced

---

[3] The need to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" is, of course, set forth in 18 U.S.C. 3553(a)(6). The Sixth Circuit has held that the statute is concerned with national disparities. *United States v. Parrish*, 915 F.3d. 1043, 1049 (6th Cir. 2019); *United States v. Rayyan,* 885 F.3d 436, 442 (6th Cir. 2018).

for bribery related offenses who pled guilty, received a 6 level increase based on the value of the bribe, and received a Government downward departure motion for substantial assistance. Just over 30% received a sentence of probation or one day imprisonment.  Just under 70% received a sentence of greater than one day; the median sentence was a year and a day, and the average sentence was 11.4 months. The analysis prepared by MCM is attached as exhibit 5.

Of the defendants that had the identical guidelines as those contained in Vincent's PSIR, just under 15% received probation and 85% received a sentence of greater than one day. For those defendants receiving greater than one day, the median sentence was 14.5 months and the average sentence was 14.7 months.

Finally, among those defendants who had the identical guidelines scoring as Vincent and pled guilty to 18 USC 371, just over 14% received probation and just under 86% received a sentence greater than one day.  The median sentence was a year and a day and the average sentence was 11.4 months.

Given Vincent's decision to withdraw from the conspiracy prior to learning of the investigation, his long history of community service, his extensive cooperation, and both his pre and post offense conduct, his mental health issues, and his relatively young age when he joined the conspiracy, counsel respectfully suggests that Vincent falls within category of those who deserve the second chance that probation affords and such a sentence would not constitute an unwarranted sentencing disparity

## CONCLUSION

Vincent Brown has acknowledged responsibility for the crime he committed. His remorse is overwhelming.  It has resulted in "severe anxiety, excessive worrying, stress, severe depression, overwhelming sadness often for weeks at a time, and poor concentration." In this sentencing memorandum, counsel has attempted to convey to the court that Vincent Brown's life in its totality is one of service, community, family, altruism, and humility.  A review of all the letters leaves no doubt that despite the conduct that led to his plea, Vincent Brown is at his core a decent and compassionate human being who deeply cares about his family, friends, and the community.  His work with charitable organizations long predates the conduct and charges in this case. While it was certainly not Vincent Brown's finer instincts that drew him into the conduct that has brought him before the Court, his untiring willingness to help others as described by family, friends, and members of the community cannot be feigned or dismissed as a mere foxhole conversion.

In closing, the counsel believes that the words of the Honorable Jed Rakoff in *United States v. Adelson,* 441 F. Supp. 2d 506, 513-514 (S.D.N.Y. 2006), are particularly apt. In *Adelson,* the defendant was convicted of securities fraud and false filings. His total offense level was 55 which called for an "advisory" guideline range of life imprisonment. The defendant, like Vincent Brown, had an exemplary background and had numerous supporters from all walks of life who wrote about his

charity, integrity, compassion, and generosity of spirit. Despite an advisory guideline range calling for life in prison, Judge Rakoff sentenced the defendant to 42 months, stating:

> But surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentence, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all of the great religions, moral philosophies, and systems of justice, was plainly what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, the "history and characteristics of the defendant."

Undersigned counsel respectfully suggests that whatever misdeeds Vincent has committed are far overshadowed by all the good has he done for his family, friends, and the community and that the requested sentence of a year of home confinement coupled with 500 hours of community service is "sufficient but not greater than necessary" to satisfy the factors set forth in 18 USC § 3353(a).

Respectfully submitted,

s/Mark J. Kriger
LaRene & Kriger, P.L.C.
645 Griswold Street, Suite 1717
Detroit, Michigan 48226
(313) 967-0100
E-Mail: mkriger@sbcglobal.net

Dated: October 4, 2023